08-1490-pr
Perkins v. Herbert

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2008


(Argued June 23, 2009)           (Decided February 23, 2010)

Docket No. 08-1490-pr

-------------------------------------------x
VICTOR PERKINS,

                    Petitioner-Appellee,

         - against -

VICTOR T. HERBERT,

                    Respondent-Appellant.
-------------------------------------------x

B e f o r e:   MINER and LIVINGSTON, Circuit Judges,
               and TRAGER, District Judge.*


         Appeal from a judgment of the United States District
Court for the Western District of New York (Bianchini, U.S.M.J.)
entered on March 10, 2008, conditionally granting the writ of
habeas corpus.

         The judgment of the district court is reversed.


_____


   * The Honorable David G. Trager of the United States District
Court for the Eastern District of New York, sitting by
designation.

JULIA PAMELA HEIT, Esq.,
New York, NY,
for <u>Petitioner-Appellee</u>

Michael C. GREEN, Esq.,
District Attorney for Monroe
County,
KELLY CHRISTINE WOLFORD, Esq.,
Assistant District Attorney,
Rochester, NY,
for <u>Respondent-Appellant</u>

Judge Trager, District Judge.

On March 27, 1998, a Grand Jury charged Petitioner Victor Perkins ("Perkins") with one count of first degree robbery (N.Y. Penal Law § 160.15(4)), two counts of criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03), two counts of criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02(4)), and one count of unlawful imprisonment in the first degree (N.Y. Penal Law § 135.10). All counts stemmed from the robbery and detention of a grocery clerk named Claudia Cruz ("Cruz").

Perkins was tried and convicted of first degree robbery and two counts of weapons possession in the third degree. However, the jury acquitted Perkins of the unlawful imprisonment charge, as well as the two counts of weapons possession in the second degree. The trial court sentenced Perkins as a second violent felony offender to concurrent prison terms, the longest of which was a term of twenty years.

Perkins appealed his conviction to the New York State Supreme Court, Appellate Division ("Appellate Division"), claiming that the trial court had violated his rights under the Confrontation Clause by admitting the Grand Jury testimony and supporting depositions of Cruz without affording him the ability to cross-examine her at a pre-trial hearing or at trial. Perkins

further argued that his Fifth Amendment rights had been violated by the introduction of a written confession that had been obtained after he invoked his right to silence. The Appellate Division accepted Perkins's argument that his constitutional rights had been violated in both instances, but nonetheless upheld his conviction on the ground that the constitutional errors had been "harmless beyond a reasonable doubt" in light of the other evidence presented at trial. People v. Perkins, 289 A.D.2d 940, 941, 735 N.Y.S.2d 273, 275 (4th Dep't 2001) ("Perkins II"), lv. denied, 98 N.Y.2d 654, 772 N.E.2d 616 (2002).

Perkins subsequently filed this petition for a writ of habeas corpus, seeking to have the district court set aside his conviction. Respondent Victor Herbert ("Herbert"), Superintendent of the Attica Correctional Facility, opposed Perkins's petition. The United States District Court for the Western District of New York (Victor E. Bianchini, U.S.M.J.),[1] however, conditionally granted the writ of habeas corpus pursuant to 28 U.S.C. § 2254, setting aside Perkins's conviction for robbery and weapons possession. Perkins v. Herbert, 537 F. Supp. 2d 481, 506 (W.D.N.Y. 2008) ("Perkins III"). According to the magistrate judge, the constitutional errors had not been harmless

_____

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to have Magistrate Judge Bianchini conduct the proceedings and enter final judgment.

2

under the "substantial and injurious effect" standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993). <u>Perkins III</u>, 537 F. Supp. 2d at 502 (citing <u>Fry v. Pliler</u>, 127 S.Ct. 2321, 2328 (2007)). We disagree with this last ruling and reverse the grant of the writ.

## Background

### (1)

### Factual Background

On February 26, 1998, at approximately 10:05 a.m., Perkins and another man named Ernesto Shannon, a.k.a. "Lucky" ("Lucky"), entered Willie's Grocery Store in the City of Rochester. According to an oral statement by Perkins, a third man, named Ted Francis ("Ted"), stood outside the grocery store acting as a lookout. After demanding Cruz's jewelry and the money from the register, the two men forced Cruz to help them contact a man named Luis Rijo, a.k.a. "Hector" ("Hector"), a local drug dealer with whom Cruz was acquainted. Perkins then paged Hector from a nearby telephone booth with the number "335," knowing that Cruz would sometimes use this number to summon Hector to the grocery store.

Once Hector arrived at the front door, Perkins and Lucky forced Cruz to participate in his capture. According to

3

testimony from Cruz, as well as a written confession from Perkins, the two men forced Cruz to meet Hector at the front door and persuade him to use the rear entrance instead. After Hector had approached the rear entrance, Cruz coaxed Hector into the store. However, soon after Hector entered, he was ambushed by Lucky and taken into the basement, where he was blindfolded, duct-taped to a chair and beaten. Lucky then threatened Hector with a semiautomatic pistol and demanded to know where Hector kept his drugs and money.[2]

Under duress, Hector relented. He spoke to the two men in Spanish, which Cruz translated, revealing that his drugs and money were located in the attic of a nearby house at 295 Avenue C. At this point, one of the two men left the grocery store in search of Hector's drugs and money.[3] However, that person soon returned to the grocery store, where the two men questioned Hector once more. Hector once again reassured the two men that he had told them the truth regarding the location of his drugs and money, and Lucky subsequently exited Willie's Grocery Store. Perkins, however, remained behind with Cruz and Hector.

---

[2] The Grand Jury indictment at issue here deals solely with the robbery and imprisonment of Cruz, and not the crimes committed against Hector. Hector did not testify at trial.

[3] According to Cruz, Perkins left at this point. However, in his written confession, Perkins states that it was Lucky who left the grocery store.

4

While the men were struggling to locate Hector's drugs and money, the police had received reports of suspicious activity and shouting coming from Willie's Grocery Store. In response to these reports, the police contacted the owner, who unlocked the store. Upon entering the basement, the officers encountered Cruz, who appeared distraught, and Hector, who was duct taped to a chair and bleeding from the head. Although she was crying, and her hands were trembling, Cruz pointed in Perkins's direction and said: "[H]e's over there." When the officers looked in this direction, they saw Perkins fleeing through the rear entrance. Officer Mark Barna ("Officer Barna"), who had been waiting outside the rear entrance, observed Perkins fleeing the grocery store and called out a radio broadcast with Perkins's description.

Shortly after receiving Officer Barna's broadcast, Officer Richard Gerbino ("Officer Gerbino") apprehended Perkins. Officer Gerbino's search revealed that Perkins was carrying a gun holster, $78.60 in cash, and numerous pieces of jewelry that would later be identified as belonging to Cruz. Officer Gerbino then brought Perkins back to the grocery store for a show-up identification by Cruz, who hesitated at first, but ultimately recognized Perkins as the man who had robbed her. Perkins then asked the officers if they caught "the other guy" and offered to

cooperate, stating his desire not to go to prison.

At the police station, Investigators Thomas Baccanti and Michael McAuliffe ("Inv. Baccanti" and "Inv. McAuliffe") read Perkins his <u>Miranda</u> warnings, which Perkins agreed to waive. Perkins initially denied that he had participated in the robbery or possessed a gun. Inv. Baccanti, however, told Perkins that he did not believe this to be true, and that Cruz had already implicated Perkins in the robbery. After making this comment, Inv. Baccanti stated: "What really happened was you pointed a gun at her, at Claudia Cruz, and you took her money and jewelry . . . that's the way it happened, isn't it?" Perkins responded, "[Y]es, that's the way it happened." Perkins also admitted to possessing a gun, and to accidentally discharging it while he was fleeing from the police. However, when Inv. Baccanti requested that Perkins reduce his statement to writing, Perkins refused. Perkins also indicated that he did not wish to discuss the matter any further, thus ending the interrogation. Perkins again refused to discuss the matter two and a half hours later, at 7:00 p.m., when the investigators attempted to re-initiate the conversation.

After waiting in the interview room by himself until 12:30 a.m., Perkins met with Investigators Thomas Janus and Glenn Weather ("Inv. Janus" and "Inv. Weather"). Inv. Janus and Inv.

6

Weather had been investigating a homicide that had occurred earlier that day at 295 Avenue C, the same site that Lucky had visited in search of Hector's drugs and money. Unaware that Perkins had earlier invoked his right to remain silent, Inv. Weather said to Perkins: "Victor, I realize that you have been - you have been read your rights and you agreed to waive them. They still stand here during the conversation we're having now and that we're going to be having over the next few minutes." Perkins replied, "[Y]eah, no problem."

The two investigators informed Perkins that they wished to discuss what had happened earlier that day, as well as a homicide that had occurred at 295 Avenue C. Under questioning about the robbery at Willie's Grocery Store, and its potential connection to the homicide at 295 Avenue C, Perkins produced a written statement detailing his involvement in the robbery of Cruz and the plot to steal Hector's drugs and money.[4] According to Perkins's written statement, he had personally taken Cruz's

---

[4] After conducting a pre-trial suppression hearing, the trial court determined that the written confession was admissible. However, both the New York Appellate Division and the magistrate judge below disagreed, and found that the written statement should have been suppressed. See Perkins III, 537 F. Supp.2d at 502 ("[T]he admission of his written statement was made in violation of the Fifth Amendment right against self-incrimination . . . ."); Perkins II, 289 A.D.2d 940 at 941, 735 N.Y.S.2d at 275 ("[T]he court should have suppressed defendant's written statement.").

chains, ring, and gold watch at gunpoint.  However, Perkins also claimed that he had not visited 295 Avenue C on the date of the robbery.  Instead, Perkins claimed in his written statement that Lucky was the only one to visit 295 Avenue C in search of Hector's drugs and money.

Approximately one month after the robbery, on March 29, 1998, the police discovered that Perkins's accomplice Lucky had been the victim of a homicide as well.  The police suspected that Ted, whom Perkins had identified as the lookout in the initial robbery, had either participated in, or had knowledge of, Lucky's death.  Furthermore, the police learned that Ted had personally approached Cruz on one occasion, reminding her of Lucky's homicide and warning her not to testify.  Ted had also contacted her step-father and boyfriend on separate occasions, conveying the same message.  As a result, Cruz refused to testify against Perkins at trial.

**(2)**

**The Sirois Hearing**

Under New York law, when a defendant is accused of causing the unavailability of a witness, the court will hold a pre-trial Sirois hearing to determine whether the defendant actually did procure the absence of the witness, in which case the admission of un-cross examined testimony of the absent witness will be

8

permitted.  See People v. Cotto, 92 N.Y.2d 68, 75-76, 699 N.E.2d 394, 398, 677 N.Y.S.2d 35, 39 (1998) ("[A]t a Sirois hearing, the People must demonstrate by clear and convincing evidence that the defendant, by violence, threats or chicanery, caused a witness's unavailability.").  Although the Supreme Court has taken "no position on the standards necessary to demonstrate such forfeiture," Davis v. Washington, 547 U.S. 813, 833 (2006), New York courts have required the prosecution to show that the defendant procured the absence of the witness by "clear and convincing evidence," People v. Geraci, 85 N.Y.2d 359, 362, 649 N.E.2d 817, 818, 625 N.Y.S.2d 469, 470 (1995) (internal quotation marks omitted), whereas the Second Circuit has adopted a "preponderance of the evidence" standard, United States v. Mastrangelo, 693 F.2d 269, 273 (2d Cir. 1982).

On February 22, 1999, the trial court held a Sirois hearing to determine whether the prosecution could introduce the grand jury testimony and supporting depositions of Cruz into evidence in lieu of her live testimony.  According to the prosecution, Perkins had enlisted the aid of Ted to warn Cruz not to testify, and thereby waived his right to cross-examine Cruz.  This Sirois hearing was intended to determine whether or not Perkins had, in fact, caused Cruz's unavailability.  See Cotto, 92 N.Y.2d at 75-76, 699 N.E.2d at 398, 677 N.Y.S.2d at 39.

9

The prosecution first called Inv. Janus, who testified as to the contents of several conversations he had had with Cruz regarding her testimony against Perkins. According to Inv. Janus, Cruz was initially reluctant to mention Ted by name. However, Cruz soon "indicated that she was seeing Ted on a regular basis driving by looking at her and that she had been approached" by Ted on one occasion. Ted reminded Cruz of the murder of Lucky, a co-conspirator in Cruz's robbery, saying that "Lucky was one of their own people and look what happened to him." Ted further explained, in the words of Inv. Janus, that "it would . . . not [be] a good idea for [Cruz] to testify." Cruz told Inv. Janus that Ted had also contacted her step-father and boyfriend, on separate occasions, suggesting to both men that Cruz should not testify.

As a result, Cruz refused to testify against Perkins, and expressed anger at Inv. Janus for continuing to request her testimony. When Inv. Janus ultimately served Cruz with a subpoena for the Sirois hearing, Cruz began to cry and said that Inv. Janus "might as well have issued her a death warrant." Cruz also remarked that Lucky had been killed "because . . . he had been talking."

Throughout these conversations, Cruz never mentioned to Inv. Janus whether she had ever been contacted by Perkins himself, and

10

never alleged that Ted had conveyed these warnings on Perkins's behalf.  Indeed, Perkins had been imprisoned continuously since his arrest on February 26, 1998, and the prison record logs reveal no contact with Ted.

Inv. Janus further testified that Ted himself was suspected of acting as the lookout in the robbery of Cruz and of possibly being involved in the homicide at 295 Avenue C that occurred the same day.  Additionally, Perkins himself had identified Ted as an accomplice in the robbery, even though "he feared for his safety by identifying him."  Furthermore, Cruz had confirmed that there was a third robber just outside the grocery store, although she told Inv. Janus that she did not see this person's face.

Next, Inv. Weather testified that Perkins had identified Ted as an accomplice.  According to Inv. Weather, Perkins had revealed that Ted had acted as a lookout during the robbery.  Accordingly, Ted remained a suspect in the robbery.  Additionally, Inv. Weather noted that Ted was a suspect in a homicide that occurred on the same day at 295 Avenue C, which the police believed may have been linked to the robbery.

The prosecution next called Investigator James Rossiter ("Inv. Rossiter"), who testified that he had served Cruz with a material witness order, compelling her presence at the Sirois hearing.  Upon receiving the order, Cruz began to cry, stating

11

that she didn't want "to be the next homicide victim" and that she was fearful of coming to court due to the threats she had received. Nonetheless, Inv. Rossiter escorted Cruz to the District Attorney's Office. Inside the District Attorney's Office, Inv. Rossiter overheard part of a conversation that Cruz was having with her boyfriend. According to Inv. Rossiter, Cruz said that "they don't care about the robbery, it's the homicide they're concerned with." Inv. Rossiter, however, did not know to whom Cruz was referring when she used the word "they."

Finally, the prosecution called Pedro Oliver ("Oliver"), Cruz's step-father. Oliver testified that a black male had approached him in his driveway, saying "make sure you tell your daughter not to go to court." The man said nothing more before walking away.

After hearing testimony from these witnesses, Cruz's attorney addressed the court. According to Cruz's attorney, Cruz "has explained to me that as a result of threats that have been made to her, she is fearful that if she testifies, even as to the threats themselves, and implicates anyone in relation to those threats, that her life will be in danger." Therefore, the attorney then represented to the court that Cruz "is not willing to testify and would not answer questions if called."

After hearing that Cruz refused to testify in open court,

12

and that Perkins refused to waive his presence during her testimony, the trial court conducted an _in camera_ proceeding, over defendant's objection, in which the court questioned Cruz outside the presence of both the defendant and the defendant's counsel, as well as the prosecution. The trial court permitted the defendant to submit written questions, which the court would ask of Cruz, but did not allow any direct questioning. Additionally, the court did not allow the defendant to see an actual transcript of the _in camera_ proceeding. Instead, the court provided the defendant with a written summary. The court explained that it believed such a procedure "could safeguard the rights of the defendant by posing relevant questions to the victim and listening to her answers, while protecting the rights of the obviously distraught witness by excluding the defendant and his counsel." People v. Perkins, 180 Misc.2d 495, 498, 691 N.Y.S.2d 273, 275 (Sup. Ct., Monroe County 1999) ("Perkins I").

During her _in camera_ testimony, which largely overlapped with the testimony of the investigators, Cruz noted that she "had a feeling that [Ted] was involved" in the robbery because "he used to hang around with [Perkins and Lucky]." Therefore, she was fearful of Ted, and reluctant to speak with Ted when he approached her after the robbery. Cruz told the judge that Ted

13

had personally warned her on one occasion not to testify, reminding her of Lucky's murder. Ted had also approached her boyfriend, while Cruz waited inside her car, conveying a similar message. Ted had even approached her step-father with the same message.

In response to written questions from Perkins's attorney, Cruz confirmed that she had not had any contact with Perkins since the date of the robbery. Furthermore, Cruz did not at any point testify that she believed that Perkins had orchestrated the threats. Nonetheless, the trial court ruled that Perkins had waived his Sixth Amendment right of confrontation, and that Cruz's grand jury testimony and supporting depositions could be admitted at trial. Perkins I, 180 Misc.2d at 500, 691 N.Y.S.2d at 277. Although the court acknowledged that "there was no direct evidence to demonstrate that the defendant orchestrated the intimidation of the victim," it nonetheless held that "the prosecutor proved the same by presenting sufficient circumstantial evidence." Id. Particularly, the court emphasized that "there was no suggestion that anyone else stood to gain from the witness's silence." Id. at 500, 691 N.Y.S.2d at 276 (quoting Cotto, 92 N.Y.2d at 77, 699 N.E.2d at 398, 677 N.Y.S.2d at 39). In a footnote, the court explained that Ted didn't have anything to gain because he was never identified by

14

Cruz as a participant in the robbery and had not been charged. Perkins I, 180 Misc.2d at 500 n.13, 691 N.Y.S.2d at 276 n.13.

**(3)**

**The Trial**

At trial, the prosecution introduced the testimony of various officers who had responded to the robbery that took place at Willie's Grocery Store. According to the testimony of these officers, Perkins had been seen fleeing from the basement of Willie's Grocery Store on February 26, 1998, leaving behind Cruz and Hector. The responding officers testified that when they arrived at the scene, Cruz appeared to be hysterical, and Hector was duct taped to a chair and bleeding from the head. Cruz's pants were unbuttoned and unzipped, and she was trembling and crying.[5] However, she pointed in Perkins's direction, saying "[H]e's over there," before Perkins could flee from the basement. Once the officers apprehended Perkins, they discovered him to be carrying numerous items of jewelry, $78.60 in cash, and a gun holster. Along Perkins's flight path, the officers also found a roll of duct tape, a .22 caliber semiautomatic pistol, a .380 caliber semiautomatic pistol, and a spent casing that matched the .22 caliber pistol. Perkins asked the officers if they caught

---

[5] According to Cruz, Lucky demanded that she lift her shirt and unbutton her pants to make sure that she was not armed.

15

"the other guy" and offered to cooperate, stating that he did not wish to go to prison.

Additionally, the prosecution introduced testimony from Inv. Baccanti and Inv. McAuliffe, both stating that Perkins had orally admitted to the robbery of Cruz. According to both investigators, Inv. Baccanti had accused Perkins of pointing a gun at Cruz and taking her jewelry, and Perkins had responded by saying, "[Y]es, that's the way it happened."

Furthermore, pursuant to the trial court's ruling at the Sirois hearing, the prosecution introduced the Grand Jury testimony of Cruz, as well as two of Cruz's depositions. According to Cruz's statements, Perkins had pointed a gun at Cruz and had stolen her jewelry under threat of force.

Finally, again, pursuant to the trial court's ruling at the pre-trial suppression hearing, the prosecution introduced Perkins's written confession. According to this written statement, Perkins confessed that he had taken Cruz's jewelry. Perkins also confessed to conspiring with Lucky to "go to the store . . . and make [Cruz] page [Hector]" so that the two men could rob Hector as well. The prosecution would ultimately stress the importance of this written statement in closing arguments, encouraging the jurors to "read[] that statement aloud [and] keep in mind [that the testimony of] the different police

16

officers . . . supports, corroborates, [and] confirms what is within that statement."

In his closing arguments, Perkins's attorney suggested that Cruz may have been an accomplice in the robbery of Hector, rather than a victim herself. To support this theory, Perkins introduced evidence that Cruz had been previously convicted of welfare fraud, and that, as a condition of her probation, Cruz was required to make restitution in excess of $9,000. In his closing statement, Perkins's attorney argued that this provided a financial motive for Cruz to conspire with Perkins and Lucky to rob Hector. With respect to the jewelry that Perkins had been carrying when he was apprehended, Perkins's attorney suggested that Cruz may have actually handed this to Perkins voluntarily. According to Perkins's attorney, Cruz may have given Perkins her jewelry in order to convince Hector that she was a victim, rather than a participant, in the robbery at Willie's Grocery Store.

Prior to deliberations, the parties agreed to present all of the exhibits to the jury, which then commenced deliberations and found Perkins guilty of first degree robbery and two counts of third degree criminal possession of a weapon. However, the jury acquitted Perkins on the unlawful imprisonment count and the two

counts of second degree criminal possession of a weapon.[6]

**(4)**

**The Appellate Division Ruling**

On direct appeal following his conviction, Perkins asserted a constitutional challenge under the Confrontation Clause of the Sixth Amendment, arguing that the trial court erred in admitting the Grand Jury testimony and supporting depositions of Cruz without allowing Perkins the opportunity to cross-examine her. Perkins II, 289 A.D.2d at 940-41, 735 N.Y.S.2d at 274. Perkins also contended that the trial court erred in refusing to suppress his written confession, which was obtained after he had invoked his right to remain silent. Id. at 941, 735 N.Y.S.2d at 274.

The Appellate Division unanimously agreed with Perkins regarding the constitutional violations, and found that the trial court had erred in admitting the Grand Jury testimony of Cruz in lieu of her live testimony. Id. According to the Appellate Division, the prosecution had failed to establish that Perkins had procured the absence of Cruz, and thus had failed to establish that Perkins waived his right to cross-examination.

---

[6] Although the jury's reasoning is not apparent from the record, the jurors may have found that the prosecution had failed to establish that Cruz had been "expose[d] . . . to a risk of serious physical injury" as required to secure a conviction for unlawful imprisonment in the first degree. N.Y. Penal Law § 135.10.

18

Id. (emphasizing that the warnings against Cruz had been made by a suspected accomplice rather than by Perkins himself). Furthermore, the Appellate Division found that the trial court erred by failing to suppress Perkins's written confession. Id. at 941, 735 N.Y.S.2d at 274-75 (quoting People v. Brown, 266 A.D.2d 838, 838, 700 N.Y.S.2d 605, 607 (4th Dep't 1999) (after a suspect has invoked his right to remain silent, interrogation must cease, and can resume "only where a significant period of time has passed since the invocation of the right to remain silent and where the police have reiterated the requisite warnings"), lv. denied, 94 N.Y.2d 860, 725 N.E.2d 1098, 704 N.Y.S.2d 536 (1999)). The Appellate Division held that Perkins had invoked his right to remain silent, and that custodial interrogation could not have constitutionally resumed unless the interrogating officer waited a significant period of time and re-read Perkins his Miranda rights. Perkins II, 289 A.D.2d at 941, 735 N.Y.S.2d at 274-75 (citing Brown, 266 A.D.2d at 839, 700 N.Y.S.2d at 607); see also Michigan v. Mosley, 423 U.S. 96, 106-07 (1975). Because the interrogating officer resumed questioning without reiterating the requisite warnings, and in fact told Perkins that he had waived his rights, the Appellate Division found that the trial court should have suppressed Perkins's subsequent written confession. Perkins II,

19

289 A.D.2d at 941, 735 N.Y.S.2d at 274-75.

Despite having found two constitutional violations, a divided Appellate Division ultimately upheld Perkins's conviction. Id. at 941, 735 N.Y.S.2d at 275. According to the majority, these errors were "harmless beyond a reasonable doubt" because "[d]efendant's oral admission of guilt was properly admitted, defendant was identified by an officer who saw him inside the store, and defendant was apprehended immediately after the robbery while in possession of the stolen property." Id. (citing Brown, 266 A.D.2d at 839, 700 N.Y.S.2d at 607). Therefore, the Appellate Division concluded, "there is no reasonable possibility that the errors might have contributed to the conviction." Id. Two judges dissented, arguing that the constitutional errors were not harmless. Perkins II, 289 A.D.2d at 942, 735 N.Y.S.2d at 275-76 (arguing that "there is a reasonable possibility that the error in admitting that evidence might have contributed to defendant's conviction") (quoting People v. Crimmins, 36 N.Y.2d 230, 237, 326 N.E.2d 787, 791, 367 N.Y.S.2d 213, 218 (1975) (internal quotation marks omitted)).

## (5)

### The District Court's Order Granting the Writ

In a pro se petition for habeas corpus under 28 U.S.C. § 2254, Perkins challenged his conviction on the same grounds,

20

asserting violations of his Fifth and Sixth Amendment rights, and arguing that those errors had not been harmless. Perkins III, 537 F. Supp. 2d at 484. After a lengthy discussion, the magistrate judge found that the Appellate Division was correct in determining that Perkins's Fifth and Sixth Amendment rights had been violated. Id. at 494-502. With respect to the Sixth Amendment Confrontation Clause issue, the magistrate judge agreed with the Appellate Division that the state trial court had failed to establish that Perkins procured the absence of Cruz, emphasizing that Ted had an independent motive to threaten Cruz on his own behalf. Id. at 494-97 ("I agree with the Appellate Division's finding on this point . . . . Singularly lacking on this record is any proof — direct or circumstantial — that Ted Francis' threats toward Cruz were made at Perkins' behest."). Likewise, the magistrate judge agreed with the Appellate Division's finding that the trial court had violated Perkins's Fifth Amendment right against self-incrimination by admitting Perkins's written confession into evidence. Id. at 501-02. Furthermore, the magistrate judge found that Perkins's Fifth and Sixth Amendment rights had also been violated by his exclusion from Cruz's questioning at the Sirois hearing itself, which the magistrate judge found to be a material stage of the trial. Id. at 497-501.

After finding these three constitutional violations, the magistrate judge proceeded to analyze the harmfulness of these violations under the standard set forward in Brecht. Id. at 502-05 (citing Brecht, 507 U.S. at 623). Although the Appellate Division had found the errors to be harmless under the Chapman test,[7] the magistrate judge still found that "a habeas court's task is to apply the Brecht standard independently," whether or not the state court had found harmlessness on its own. Perkins III, 537 F. Supp. 2d at 503 (citing Fry, 127 S.Ct. at 2321). Accordingly, rather than reviewing the state court's application of the Chapman test, the magistrate judge proceeded to independently analyze whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." Perkins III, 537 F. Supp. 2d at 503 (quoting Brecht, 507 U.S. at 635) (internal quotation marks omitted).

In applying the Brecht standard for harmlessness, the magistrate judge relied on Delaware v. Van Arsdall, 475 U.S. 673 (1986), a case that developed five factors to assess when

---

[7] The Appellate Division used the harmless error standard of review from Crimmins, 36 N.Y.2d at 237, 326 N.E.2d at 791, 367 N.Y.S.2d at 218, which incorporates the standard of review from Chapman. Gutierrez v. McGinnis, 389 F.3d 300, 307-08 (2d Cir. 2004).

evaluating whether a Confrontation Clause error is harmless.[8]
Perkins III, 537 F. Supp. 2d at 504-05.  The magistrate judge
also stressed that there is a "substantial burden of persuasion
on the State" to prove harmlessness to a federal habeas court,
id. at 503 (quoting Fry, 551 U.S. at 122 (Stevens, J.,
concurring) (internal quotation marks omitted)), and that a
federal court's "grave doubt" regarding harmlessness should be
resolved in favor of the habeas petitioner, id.

     After evaluating the five Van Arsdall factors, the
magistrate judge concluded that the constitutional errors "had
substantial and injurious effect or influence in determining the
jury's verdict," and issued the writ of habeas corpus. Id. at
505-06 (quoting Brecht, 507 U.S. at 623) (internal quotation
marks omitted).

## Discussion

### (1)

### Constitutional Violations

     On appeal, appellant Herbert argues that the magistrate
judge erred in finding that Perkins's Fifth and Sixth Amendment

_____

     [8] Although the Supreme Court initially developed the Van
Arsdall factors under Chapman review, we have analyzed these same
factors when evaluating the harmfulness of a constitutional
violation under Brecht analysis as well.  See, e.g., Brinson v.
Walker, 547 F.3d 387, 395 (2d Cir. 2008).

rights had been violated by the admission of Cruz's testimony and Perkins's written confession. Even though the Appellate Division and magistrate judge below both agreed that the trial court violated Perkins's constitutional rights by admitting this evidence, Herbert urges this court to find otherwise, and to hold that the state trial court acted reasonably in making its determination. Perkins III, 537 F. Supp. 2d at 496; Perkins II, 289 A.D.2d at 941, 735 N.Y.S.2d at 274. For the reasons below, we decline to do so.

With respect to the Confrontation Clause error in admitting Cruz's testimony, Herbert argues that the state trial court acted reasonably in determining that Perkins procured the absence of Cruz, notwithstanding the Appellate Division's rebuke of that very same position. Perkins II, 289 A.D.2d at 941, 735 N.Y.S.2d at 274 ("[A]ll of the threats warning [Cruz] not to testify were made by a suspected accomplice [Ted], not defendant [Perkins]." (emphasis added)). In support of this contention, Herbert reiterates the trial court's argument that Perkins had a motive to procure the absence of Cruz, and that Perkins was the "only person who stood to gain" from Cruz's silence. However, the Appellate Division and magistrate judge both correctly observed

that this argument misstates the facts presented below.[9]

In this case, the prosecution merely demonstrated that Perkins had a motive to procure Cruz's silence.  It did not demonstrate, however, that Perkins took any steps to orchestrate the intimidation of Cruz.  It did not even demonstrate that Perkins had the opportunity to do so, which is particularly significant due to the fact that Perkins was incarcerated continuously since the date of the robbery, and the prison record logs reveal no contact with either Cruz or Ted.  Cf. Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003) (finding that defendant procured the absence of a witness in part because the defendant "had the opportunity to arrange for [the witness's] intimidation because he was out on bail both prior to and during the trial" (internal quotation marks omitted)).

Furthermore, even Perkins's motive to silence Cruz — the

---

[9] The Appellate Division found that "[t]he People failed to establish that the witness's unavailability was procured by [Perkins]" under New York's application of the Confrontation Clause, Perkins II, 289 A.D.2d at 941, 735 N.Y.S.2d at 274, which requires the prosecution to demonstrate that the defendant procured the absence of the witness by "clear and convincing evidence," People v. Geraci, 85 N.Y.2d 359, 362, 649 N.E.2d 817, 818, 625 N.Y.S.2d 469, 470 (1995) (internal quotation marks omitted).  However, this court requires the prosecution to prove the same by a "preponderance of the evidence."  United States v. Mastrangelo, 693 F.2d 269, 273 (2d Cir. 1982).  Regardless, the prosecution here clearly failed to demonstrate that Perkins procured the absence of the witness, even under this court's more forgiving "preponderance of the evidence" standard.

25

only real evidence linking Perkins to the threats — was shared by Ted, the man who personally conveyed the threats to Cruz. Perkins III, 537 F. Supp. 2d at 497. Ted had already been identified by Perkins as an accomplice in the robbery of Cruz, and the Sirois hearing demonstrated that the police suspected Ted of being involved in two related homicides, as well as in the robbery itself. According to Inv. Janus, even Cruz had acknowledged that there was a third robber just outside Willie's Grocery Store, although she claimed that she did not see this person's face.[10] Although Cruz may not have explicitly identified Ted as a participant in the robbery, there has been no showing that Ted was aware of this fact. Furthermore, even if he were aware that Cruz had failed to explicitly identify him, Ted would still have a motive to prevent Cruz from testifying under oath about the facts of the robbery and potentially revealing his involvement. Given these circumstances, Ted had a strong, independent incentive to prevent Cruz from testifying in court and potentially implicating him. When we further consider that Cruz herself never indicated that Perkins had orchestrated the threats, we must conclude that the prosecution failed to meet its burden in showing that Perkins procured the absence of the

---

[10] Nonetheless, during her in camera testimony, Cruz noted that she "had a feeling that [Ted] was involved, being that he used to hang around with [Perkins and Lucky]."

26

witness, and that the Appellate Division and magistrate judge, therefore, both correctly concluded that Perkins did not waive his right of confrontation.[11]

With respect to the _Miranda_ violation in admitting the written confession of Perkins, Herbert argues that the state trial court was correct in finding that Perkins's written confession was not obtained in violation of his right to remain silent, due to the fact that the police waited several hours after Perkins invoked his right before resuming questioning, and "advised [Perkins] that the rights and warnings he was previously given still applied." However, again, this statement does not accurately reflect the facts of the case, and we therefore agree with the Appellate Division and magistrate judge, which both

---

[11] According to the magistrate judge, the admission of Cruz's testimony was caused by two separate constitutional violations. First, it was caused by the trial court's violation of Perkins's right of confrontation, and, second, it was caused by the trial court's violation of Perkins's constitutional right to be present at a material stage of the trial (i.e., the _Sirois_ hearing). _Perkins III_, 537 F. Supp. 2d at 494-501. With respect to the second violation, the magistrate judge noted that Perkins's presence at the _Sirois_ hearing could have produced more effective cross-examination, which might have ultimately led to the exclusion of Cruz's testimony from the trial. _Id._ at 497-501. However, whether or not there was an exclusion from a material stage of the trial that contributed to the admission of Cruz's testimony, we still find that the trial court erred in admitting the testimony of Cruz. Therefore, there is no need to discuss the merits of the magistrate judge's second argument, and we can proceed to analyze whether the admission of Cruz's testimony amounted to harmless error.

27

found that Perkins's right to remain silent was not "scrupulously honored" by the interrogating officers. See Mosley, 423 U.S. at 104 (explaining that, after one invokes his right to remain silent, the admissibility of any further statements depends upon whether that right to remain silent has been "scrupulously honored." (internal quotation marks omitted)).

In this case, the interrogating officers failed to re-read Perkins his Miranda rights before resuming questioning, even though Perkins had previously invoked his right to remain silent. See Campaneria v. Reid, 891 F.2d 1014, 1021 (2d Cir. 1989) ("Questioning can be resumed after fresh Miranda warnings are given and the right to remain silent is otherwise scrupulously honored." (emphasis added)); Wilson v. Henderson, 584 F.2d 1185, 1187-88 (2d Cir. 1978) (Where a person has invoked his right to remain silent, "[Q]uestioning can resume after new warnings have been given." (emphasis added)); see also Brown, 266 A.D.2d at 838, 700 N.Y.S.2d at 607 (interrogation can resume "only where a significant period of time has passed since the invocation of the right to remain silent and where the police have reiterated the requisite warnings." (emphasis added)). Additionally, even though Herbert suggests that the officers "reminded" or "advised" Perkins that he had previously been read his rights, the record reveals that the officers positively stated that Perkins had

"waived" these rights.  Perkins III, 537 F. Supp. 2d at 485
(before resuming questioning, the investigator stated: "Victor, I
realize that you have been - you have been read your rights and
you agreed to waive them." (emphasis added)).  Therefore, under
these facts, we adhere to the determinations of both the
Appellate Division and magistrate judge, finding that the
interrogating officers did not honor Perkins's right to remain
silent, and that the subsequently obtained written confession was
erroneously admitted.

Nonetheless, Confrontation Clause errors and Miranda
violations are both subject to harmless error review.  Delaware
v. Van Arsdall, 475 U.S. 673, 684 (1986) (Confrontation Clause
errors are subject to harmless error review.); Zappulla v. New
York, 391 F.3d 462, 466 (2d Cir. 2004) (Miranda violations are
subject to harmless error review.).  For the reasons discussed
below, we find both of these errors to be harmless.

**(2)**

**Harmless Error**

**a.   Standard of Review**

Where a state appellate court has found that a state trial
court committed a constitutional violation but has held that the
violation was harmless, the standard of review for a federal
court conducting habeas corpus review has not yet been clearly

29

established.  Compare Johnson v. Acevedo, 572 F.3d 398, 404 (7th Cir. 2009), with Ruelas v. Wolfenbarger, 580 F.3d 403, 412-13 (6th Cir. 2009).  Instead, federal courts have developed two different approaches to the standard of review to apply on habeas review.

Under one approach, first outlined in Brecht v. Abrahamson, a federal habeas court must assess, in its own judgment, whether the constitutional error resulted in "actual prejudice" to the defendant.  507 U.S. 619, 637-39 (1993) (internal quotation marks omitted); see also id. at 639 (holding that the state's unconstitutional references to the habeas petitioner's post-Miranda silence amounted to harmless error where the references were infrequent, the state's properly admitted references to the petitioner's pre-Miranda silence were more frequent, and "the State's evidence of guilt was, if not overwhelming, certainly weighty"); Ruelas, 580 F.3d at 412-13.  Rather than requiring the prosecution to demonstrate that the error was "harmless beyond a reasonable doubt," as has traditionally been required on direct review, Brecht held that habeas relief is not warranted unless, "in light of the record as a whole, [the constitutional violation] had substantial and injurious effect or influence" in securing the defendant's conviction.  507 U.S. at 638 (emphasis added).  Due to its concerns with finality, comity and

30

federalism, the <u>Brecht</u> court intentionally designed this standard to be "less onerous" to the state than the harmlessness test generally used on direct review of a constitutional error.  <u>Id.</u> at 637.

Under the other approach, first outlined in <u>Mitchell v. Esparza</u>, a federal habeas court must assess whether the state appellate court acted reasonably in determining that the error was "harmless . . . beyond a reasonable doubt."  540 U.S. 12, 17-19 (2003) (per curiam) (internal quotation marks omitted); <u>Gutierrez v. McGinnis</u>, 389 F.3d 300, 306 (2d Cir. 2004).  The <u>Mitchell</u> court derived this approach from the <u>Chapman</u> test, traditionally used on direct review, which requires the prosecution to demonstrate that the error was harmless beyond a reasonable doubt.  <u>Mitchell</u>, 540 U.S. at 17-19; <u>see also</u> <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967).  Subsequent to <u>Chapman</u>, Congress tightened the statutory requirements for a writ of habeas corpus by passing the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  <u>See</u> <u>Fry v. Pliler</u>, 127 S.Ct. 2321, 2326 (2007).  Under AEDPA, an application for a writ of habeas corpus may not be granted with respect to a claim that has been adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In applying the "unreasonable application" clause of AEDPA to a state appellate court's Chapman analysis, Mitchell held that "[w]e may not grant respondent's habeas petition . . . if the state court simply erred in concluding that the State's errors were harmless [under Chapman's 'harmless beyond a reasonable doubt' standard]; rather, habeas relief is appropriate only if the [state court of appeals] applied harmless-error review in an 'objectively unreasonable' manner." Mitchell, 540 U.S. at 18; see also id. at 17-19 (omitting any mention of the Brecht test, and holding that a state court's harmlessness finding regarding improper jury instructions was not "objectively unreasonable"); see also Gutierrez, 389 F.3d at 306 ("Mitchell signals, and we therefore hold, that when a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied Chapman."); but see Fry, 551 U.S. at 121-22 (holding that Brecht applies on habeas corpus review "whether or not" the state court conducted its own harmless-error review under Chapman's "harmless beyond a reasonable doubt" standard). This AEDPA/Chapman test imposes a high burden on a

32

reviewing court, and requires a federal court on habeas review to ask "whether the state court's application of clearly established federal law was <u>objectively unreasonable</u>."  <u>Williams v. Taylor</u>, 529 U.S. 362, 409 (2000) (emphasis added); <u>see also</u> <u>id.</u> at 410 ("[T]he most important point is that an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law.").  Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id.</u> at 411; <u>see also</u> <u>Sorto v. Herbert</u>, 497 F.3d 163, 169 (2d Cir. 2007) (Under the "unreasonable application" clause of AEDPA, "petitioner must identify some increment of incorrectness beyond error in order to obtain <u>habeas</u> relief.").

Recently, the Seventh Circuit held that a habeas court must explicitly find both a lack of reasonableness under AEDPA/<u>Chapman</u> and harm under <u>Brecht</u> before issuing the writ of habeas corpus.  <u>Johnson</u>, 572 F.3d at 404.  The Sixth Circuit, by contrast, found that the <u>Brecht</u> test "subsumes" the AEDPA/<u>Chapman</u> test, and that, therefore, only the <u>Brecht</u> test should be applied on habeas review of a state appellate court's determination of harmlessness.  <u>Ruelas</u>, 580 F.3d at 412-13 ("[I]t certainly makes

33

no sense to require formal application of both tests (AEDPA/<u>Chapman</u> and <u>Brecht</u>) when the latter obviously subsumes the former.") (quoting <u>Fry</u>, 127 S.Ct. at 2327).  Both circuits agree, however, that a finding of harmlessness under <u>Brecht</u>, by itself, is sufficient to deny the writ of habeas corpus.

We need not decide whether both tests apply in such a scenario, or whether <u>Brecht</u> applies by itself.  For present purposes and in keeping with Second Circuit precedent, we now "decline[] to decide the question because we conclude[] that the result [is] the same under either test."  <u>Brown v. Keane</u>, 355 F.3d 82, 91 (2d Cir. 2004); <u>see also</u> <u>Howard v. Walker</u>, 406 F.3d 114, 123 (2d Cir. 2005) ("Where the question has arisen [regarding the <u>Chapman</u> and <u>Brecht</u> standards of review], this court has declined to resolve it, finding instead that the harmlessness determination would be identical under either analysis"); <u>Benn v. Greiner</u>, 402 F.3d 100, 105 (2d Cir. 2005) (referring to the "open question" of whether AEDPA/<u>Chapman</u> or <u>Brecht</u> applies, and declining to resolve that issue because the standards both "produce the same result in this case"); <u>Gutierrez</u>, 389 F.3d at 305 (noting the "persistent similarity in outcomes" of the AEDPA/<u>Chapman</u> and <u>Brecht</u> tests, and stating that

it is "unlikely" for a constitutional harm under <u>Brecht</u> to be harmless under AEDPA/<u>Chapman</u>). For the reasons that follow, we hold that the errors were harmless under both tests.

**b. The Constitutional Errors Were Harmless**

In conducting our harmless error review, we must ultimately decide whether the Confrontation Clause and <u>Miranda</u> violations at issue resulted in "actual prejudice" to Perkins, <u>Brecht</u>, 507 U.S. at 637 (internal quotation marks omitted), and whether the Appellate Division acted unreasonably in finding harmlessness, <u>Mitchell</u>, 540 U.S. at 18. This requires us to analyze several factors in an effort to assess the "importance [that] the error[s] should reasonably have had." <u>United States v. Mejia</u>, 545 F.3d 179, 199 n.5 (2d Cir. 2008).

The factors to be assessed in determining the harmlessness of Confrontation Clause and <u>Miranda</u> errors largely overlap. Under both the AEDPA/<u>Chapman</u> and <u>Brecht</u> analyses, when assessing the harmlessness of the admission of testimony in violation of the Confrontation Clause, this court has traditionally examined several factors first discussed in the <u>Van Arsdall</u> case. <u>See</u> <u>Brinson</u>, 547 F.3d at 395 (applying the <u>Van Arsdall</u> factors under <u>Brecht</u> review); <u>Benn</u>, 402 F.3d at 105-06 (applying the <u>Van</u>

<u>Arsdall</u> factors under <u>Brecht</u> review, and noting that it produces the same result as AEDPA/<u>Chapman</u> review); <u>Gutierrez</u>, 389 F.3d at 308 (applying the <u>Van Arsdall</u> factors under AEDPA/<u>Chapman</u> review). "These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." <u>Van Arsdall</u>, 475 U.S. at 684. Additionally, when a confession has been improperly admitted in violation of <u>Miranda</u>, this court has assessed the harmlessness of the error by evaluating similar factors, including: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." <u>Zappulla</u>, 391 F.3d at 467-68 (applying AEDPA/<u>Chapman</u> review to a state court's finding of harmlessness); <u>Robinson v. Greene</u>, 507 F. Supp. 2d 279, 300 (W.D.N.Y. 2007) (applying <u>Zappulla</u> factors on <u>Brecht</u> review).

Ultimately, however, "[t]he strength of the prosecution's case is probably the single most critical factor" in a harmless error analysis. <u>United States v. Reifler</u>, 446 F.3d 65, 87 (2d Cir. 2006) (quoting <u>Latine v. Mann</u>, 25 F.3d 1162, 1167-68 (2d Cir. 1994) (alteration in original)). "Although harmless error analysis originally focused on whether the error had affected the jury, over the years our focus has shifted from the impact of the error on the jury's analysis to an assessment of the strength of the remaining evidence of guilt." <u>Mejia</u>, 545 F.3d at 199 n.5 (citations omitted).

Applying these factors here, we conclude that the erroneously admitted evidence was cumulative of the properly admitted evidence, and that the remaining evidence of guilt, including Perkins's oral confession, was strong. Therefore, we hold that Perkins did not suffer "actual prejudice," <u>Brecht</u>, 507 U.S. at 637 (internal quotation marks omitted), and that the Appellate Division's finding that the errors were harmless was correct, and certainly not "objectively unreasonable."[12]

---

[12] In granting the petition for habeas corpus, the magistrate judge below did not specify whether the writ was granted with respect to the robbery charge only, or with respect to Perkins's conviction of two counts of possession of a weapon in the third degree as well. <u>Perkins III</u>, 537 F. Supp. 2d at

<u>Mitchell</u>, 540 U.S. at 18; <u>Williams</u>, 529 U.S. at 409.

In this case, the testimony of Cruz constituted significant evidence of guilt and, as such, was "important" to the prosecution's case. See <u>Brinson</u>, 547 F.3d at 395 (testimony of the victim and sole witness to a robbery was "more than important" to the prosecution's case); <u>Benn</u>, 402 F.3d at 106-07 (holding that Confrontation Clause error was harmless "in the face of the overwhelming evidence" of guilt, but noting that the testimony of the rape victim herself was "certainly important to the prosecution's case"). However, Cruz's testimony regarding the robbery was merely cumulative of the properly admitted evidence, which included an explicit oral confession from Perkins himself. See <u>United States v. Lee</u>, 549 F.3d 84, 99 (2d Cir. 2008) (Straub, J., concurring in part and dissenting in part); <u>Reifler</u>, 446 F.3d at 88 (2d Cir. 2006); <u>United States v. McClain</u>, 377 F.3d 219, 223 (2d Cir. 2004); <u>Williams v. Greene</u>, No. 04-CV-4507, 2009 WL 2579259, at *4 (E.D.N.Y. Aug. 20, 2009).

---

484, 506.  Because the judge stated that Perkins's habeas petition "challeng[es] his conviction . . . on one count of robbery in the first degree and two counts of criminal possession of a weapon in the third degree" and ultimately granted the petition, we assume that the habeas petition was directed to all counts of conviction.

38

Although the magistrate judge below cited to several cases in arguing that Cruz's testimony could potentially have bolstered Perkins's confession, and therefore was not cumulative, Perkins III, 537 F. Supp. 2d at 504, all of the cases cited by the magistrate judge involved the bolstering of testimony of a third party in a relatively weak case as compared to the present one. See Arizona v. Fulminante, 499 U.S. 279, 299 (1991); Cotto, 331 F.3d at 254; Vasquez v. Jones, 496 F.3d 564, 576 (6th Cir. 2007); Stapleton v. Wolfe, 288 F.3d 863, 865-67, 868 (6th Cir. 2002). In this case, by contrast, Perkins was apprehended while fleeing the scene with the stolen property, and personally confessed to the investigators that he had robbed Cruz at gunpoint. Under these circumstances, Cruz's testimony regarding the events of the robbery may be considered cumulative of the other testimony and evidence clearly establishing Perkins's involvement in the robbery.

At trial, Perkins introduced no testimony or evidence directly contradicting Cruz's account of the robbery on any material points, which also weighs in favor of finding harmless error. Indeed, Cruz's account of the robbery was strongly corroborated by Perkins's oral confession, as well as by the fact

39

that Perkins was apprehended while fleeing the scene with the stolen property.  While Perkins's attorney did raise a possible defense in his summation, suggesting that no actual robbery had taken place at Willie's Grocery Store, this defense was not plausible and was not supported by other evidence.  According to Perkins's attorney, Cruz may have been a co-conspirator in the robbery of Hector, and may have voluntarily given Perkins her jewelry in order to fool Hector into falsely believing that she was a victim as well.

Perkins's proffered defense is undermined by the observations of the police officers who arrived at Willie's Grocery Store.  As the responding officers testified at trial, Cruz was found in the basement of Willie's Grocery Store with her pants unbuttoned and unzipped.  The responding officers observed that Cruz was disheveled, hysterical and crying.  She trembled as she pointed towards Perkins, saying "[H]e's over there."  This is not the demeanor of a co-conspirator.  Rather, this more closely resembles what one would expect from a robbery victim.  Therefore, although the complete preclusion of cross-examination "weighs heavily in favor of" finding harm, the fact that Perkins introduced no evidence disputing Cruz's account of the robbery —

which was strongly corroborated by other admissible evidence —
similarly weighs against finding harm.  See Herbert, 331 F.3d at
254.

With respect to the erroneously admitted confession, "[t]he
persuasive influence of a signed confession cannot be
[over]estimated."  Zappulla, 391 F.3d at 473.  Indeed, this was
very strong evidence tending to demonstrate Perkins's guilt.  Id.
("The fact that the evidence at issue is a signed detailed
confession should weigh heavily against finding that its
erroneous admission was harmless.").  However, the mere fact that
there is a recorded confession should not detract from the fact
that the prosecution already properly admitted an oral confession
from Perkins, stating essentially the same facts.  See
Campaneria, 891 F.2d at 1022 (where the prosecution properly
admits an untainted oral confession, but also improperly admits a
subsequent recorded confession to the same crime, the recorded
confession is considered "entirely cumulative," and its admission
is considered to be harmless error).  "Although a recorded
confession can be impressive evidence in a criminal trial," this
does not by itself warrant a finding of harmful error when there
is already a properly admitted oral confession "that came in

41

through the testimony of the police officers." Id. In this case, the properly admitted oral confession was not seriously disputed, and there was no evidence that the confession was the product of unlawful coercion of any kind. Therefore, the existence of Perkins's oral confession undercuts the impact of the written confession.

With respect to the prosecution's conduct, we must note that the prosecution emphasized the importance of Perkins's written confession and Cruz's testimony during closing arguments, which weighs against finding harmless error. See Lee, 549 F.3d at 91-92. However, "our focus [on harmless error review] has shifted from the impact of the error on the jury's analysis to an assessment of the strength of the remaining evidence of guilt." Mejia, 545 F.3d at 199 n.5; see also Brecht, 507 U.S. at 637 ("[G]ranting habeas relief merely because there is a reasonable possibility that trial error contributed to the verdict is at odds with the historic meaning of habeas corpus - to afford relief to those whom society has grievously wronged." (internal quotation marks and citations omitted)). Therefore, the prosecution's conduct does not weigh as heavily in our analysis as the overall strength of the prosecution's remaining case.

In sum, although some of the above-mentioned factors weigh in favor of finding harmful error, the strength of the prosecution's case - the most important factor in our inquiry - weighs heavily in favor of finding harmless error. Contrary to the magistrate judge's assessment that the prosecution's case was "fairly weak" without these items of evidence, we conclude that the remaining evidence against Perkins was quite strong. Perkins III, 537 F. Supp. 2d at 505; see also Brecht, 507 U.S. at 639 (finding harmless error where "the State's evidence of guilt was, if not overwhelming, certainly weighty"). Here, as the Appellate Division stated, "[Perkins's] oral admission of guilt was properly admitted, [Perkins] was identified by an officer who saw him inside the store, and [Perkins] was apprehended immediately after the robbery while in possession of the stolen property." Perkins II, 289 A.D.2d at 941, 735 N.Y.S.2d at 275. This constitutes very significant evidence of guilt, particularly given Perkins's oral confession. Fulminante, 499 U.S. at 296 ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." (internal quotation omitted)). Furthermore, as previously discussed, Perkins's explanation of why he was fleeing with

43

Cruz's jewelry was not plausible and was contradicted by other evidence.  Therefore, because the remaining evidence of guilt was so strong, and because the erroneously admitted evidence was cumulative of the properly admitted evidence, we find that the erroneously admitted evidence did not result in "actual prejudice" to Perkins, Brecht, 507 U.S. at 637 (internal quotation marks omitted), and that the Appellate Division reasonably concluded that the errors were harmless.  Mitchell, 540 U.S. at 18.


## Conclusion

Because we hold that the constitutional violations at issue were harmless, we reverse the district court's grant of the writ of habeas corpus.

44